individually and on behalf of all others similarly situated. Mr. Frank. Thank you, Mr. Chief Justice, and may it please the Court. Amchem instructs that courts should interpret Rule 23 with the interests of absent class members in close view. The best way to interpret Rule 23's text requiring settlements be fair and reasonable is to align class counsel's interests with those of the absent class members. In Deposit Guarantee v. Roper at page 339, this Court called it an abuse when class members were not the primary beneficiaries of a class action. How can it be fair and reasonable for a court to endorse such an abuse? Why is it an abuse? Because practically, the class members would get nothing. Nothing at all. And here at least they get an indirect benefit. Well, the indirect benefit is even less than nothing. The — it was feasible to distribute money to class members, and instead class counsel chose to agree to a settlement that directed that money elsewhere. How much would it have come to for each class member? Each claiming class member probably could have gotten between $5 and $10 with typical claims rates. If, for example, in the Fraley v. Facebook settlement, the court rejected an all-side praise settlement. Sorry. There's an amicus brief that talked — who's laid out pretty thoroughly the costs associated with, first, identifying the class, second, preparing the mailing, third, executing the mailing, and then processing the claims that came up with a figure of 67 cents. Now, putting aside that there may be a question about whether the trial court adequately determined feasibility, but assuming it did, why would it have been an abuse of discretion for the court to believe that processing 67 cents didn't make sense because the costs would outweigh what they would pay? Well, the district court applied the wrong legal standard, but — No, no. I know your standard of feasibility is can we give 10 percent of the class something even if nobody else gets anything? Meaning what you would like to do is select 10 percent of the class and pay them alone and do nothing for everybody else. Well, no. We would like to give everybody in the class the opportunity to make a claim, and in practice, a very small minority of the class would not be indifferent to the opportunity and take advantage. Everybody else would receive not even an indirect benefit. No. They would receive the opportunity to make a claim. They always have that opportunity. They don't have that opportunity here. As a class member, class members were deprived of that opportunity. They could opt out. They could opt out in AMCHM also, but that didn't make the settlement fair. But I go back to my point, which is, are you disputing the finding of fact that under the normal application of feasibility, whether cost outweighs the payment or cost far exceeds whatever could be given out? Is that – are you disputing that? The Court never made that finding. The Court applied the Ninth Circuit's de minimis test under Lane v. Facebook, which required it to divide by the entire denominator of the entire class. In reality, settlements settle all the time for well under a dollar per class member and then successfully distribute that money to the class, because most class members are just simply indifferent to the opportunity for these small sums. And then is it all right to have some kind of a secret doctrine operate? I don't understand the question, Justice. I apologize. Ginsburg. Suppose the class members are notified and only 10 percent of them make a claim. What happens to the rest of the amount that was agreed upon as a settlement? First of all, in practice, I just want to let the Court know that 10 percent is an extraordinarily high claim rate. The claims rate is typically below 1 percent. But – And then the 99 percent. Absolutely. In the typical settlement, it's a pro rata distribution. You have a fund of a few million dollars. That's tens of millions of class members have the opportunity to make a claim. A very small percentage make the claim, and the fund is distributed pro rata to them. That's what happens in Fraley, where the number of class members making claims was so small, they still had money left over, even after giving every claiming class member $15, even though we were talking $9 million for 150 million class members. That's 6 cents per class member. What do they do? Do they wait until a reasonable period and figure out most of the claims are in and then divide it up, or? The settlement procedures will establish 90 days or 60 days or 120 days to make a claim. The claims come in either electronically or through paper, depending on how the claims process is set up. And sometimes there's an audit for – to make sure there aren't fraudulent claims. That's what happens in Carrier IQ, where, again, even though we were talking pennies per class member, it only cost them $600,000 to distribute a few million dollars to 30 million class members and still audit the claims and reject 30 percent of the claims. So – I'm sorry. I'm talking – this is a full CyPRAE award, meaning there's no direct benefit to the class. What about the residual CyPRAE? I thought in many instances, if a fund is created and the claimants are all paid off, there's some money left over, the residual CyPRAE, and that's given indirectly, often. Circuits differ on that. The Seventh rejects that proposal because they recognize that the settling parties have the ability to adjust the claims rate by depending on how difficult they make the claims process. So in a Seventh Circuit case, there was a $1.1 million residual and 12 million class members, though that was 8 cents per class member. The Court rejected the idea that that was a benefit to the class and said you've made the claims process too hard and required them to redo the settlement on remand. Millions more dollars went to the class because they changed the claims process and made it easier for class members to make claims. So if you have a residual and you incentivize the attorneys to prefer the residual to the actual claims, what will happen is you'll have a very difficult claims  process. There was a Third Circuit case, a $35 million fund, and but you had to fill out a 5-page claim form to claim your $5. And so very few class members did that. They were only going to distribute $3 million with over 15 million to CyPRAE. And the Third Circuit rejected that. That the district court failed to prioritize direct benefit to the class. Sotomayor, assuming all of that, let's assume a very efficient claim process. Let's assume a careful feasibility study by the district court. Are you still, you're still taking the position that if there's a residual for any reason that's legitimate, there's been an easy claims process, there's been a simple distribution, whatever, you're still saying that an indirect benefit, a partial CyPRAE, is not okay? I'm saying that you can't reward class counsel for it. You have to incentivize them to prioritize the direct benefit to the class. So your position is that CyPRAE is okay, but we should write legislation in our opinion saying that we can't pay class counsel for that. Have you read the Third Circuit opinion that talks about this and says there's a lot to balance in this issue? And are the courts the appropriate one or is Congress the appropriate one? Or is the individual district court's discretion appropriate until the Congress looks at this and decides? I think Rule 23e means something. And this Court has previously called disproportionate benefits an abuse. And it's very clear that Rule 23, it's not the case that everything goes under Rule 23e so long as the district court rubber stamps it. In a case such as this, is any effort made, and would it even be possible to determine whether every absent class member or even most of the absent class members regard the beneficiaries of the CyPRAE award as entities to which they would like to make a contribution? It's very possible to establish a claims process where somebody checks a box and said, instead of sending me a check for $6, send it to the American Cancer Society. Nobody does that, or at least we haven't seen settlements that do that. And the reality is if class members want to send their money to charity, they can do it without the intermediary of class counsel. So who decides who these beneficiaries are going to be? It varies from settlement to settlement. In this case, class counsel and Google negotiated and agreed to a set of six beneficiaries. That process was opaque, and we don't understand which beneficiaries didn't make the cut and why they didn't make the cut, but they chose these particular beneficiaries. So the parties and the lawyers get together and they choose beneficiaries that they personally would like to subsidize? That's how it works? That's usually how it works. We've had – I've seen settlements where the judge says I don't like these beneficiaries, pick these beneficiaries. Where the judge has designated the beneficiaries? There are settlements structured where the judge designates the beneficiaries. And in another Google settlement that we discussed in our opening brief, the parties designated a beneficiary and the court redesignated the beneficiary. Kagan. I'm sorry. Please go ahead. Justice Kagan. I was going to change the subject. So was I. Jurisdiction? Yes. Go for it. May I ask you, Mr. Frank, to address the standing issue in this case, to talk about what you think the harm was and whether any court has addressed your theories about the harm? Are you talking my harm or the harm of the plaintiffs? The harm of the plaintiffs. The harm of the plaintiffs. We discussed that at pages 25 and 26 of our reply brief. And one of the named plaintiffs, Anthony Italiano, alleges a statutory violation that corresponds to the common law tort of public disclosure of private facts. And the lower courts are unanimous in holding that that kind of statutory claim satisfies Spokio. Even on remand in Spokio, the Ninth Circuit found standing, and this Court denied cert the second time up. So I don't think there's a real standing issue unless the Court is inclined to expand Spokio. I had thought, Mr. Frank, that the lower court thought that there would be standing just because it was a statutory claim, and that there was no reason that the plaintiff had to show a particularized or a concrete injury. That is certainly the wrong standard for the district court to have applied, with later Supreme Court jurisprudence indicating that. But we can determine from the face of the complaint that Anthony Italiano made an allegation of concrete injury within the ambit of what Justice Thomas' concurrence in Spokio indicated was acceptable, and what lower courts have unanimously indicated that was acceptable. Roberts. I was curious where you were going to come down before you filed your brief, because obviously if there's no standing, the whole class action is thrown out, right? That would be correct. That would be the right thing to do, under Arizonans, for proper English, or official English. That's exactly what the Court did. The Court found that the lower courts did not have jurisdiction and vacated everything. You say, to follow up with Justice Kagan, who anticipated exactly where I wanted to go, you say there's an allegation with respect to Mr. Italiano that he was injured. But do we know that he was injured? Is there any evidence that his personal information, for example, wasn't already available through the White Pages and otherwise published so that there is no injury in fact? Well, that goes to the merits. If I allege that my friend here punched me in the head and owes me over $75,000 and we're citizens of different States, I have a claim for standing, even if that claim is completely fictional. Well, fair enough at a 12B6 stage, but here we're entering a final judgment. And should we at least remand to a lower court to make a decision as to whether there is actually standing, as opposed to mere allegation of standing? I don't think that's the case. I think the allegation of concrete injury establishes the standing, and then the merits question is always different than the jurisdictional question. What is the private? I mean, what I have here, my law clerk read up, is that the search that Mr. Italiano engaged in was his name, that's certainly public, his home address, I imagine that's public, name in bankruptcy, his name in foreclosure proceedings, his name in short sale proceedings, his name in Facebook, and his name in the name of his then-soon-to-be ex-wife, and the words forensic accounting. Now, how goes the – if that – if all the things that he looked up, how are the – what concrete injury was there because somebody might discover through Google that he made those searches? I mean, I don't quite see how this is some kind of secret or private or information, and I don't see alleged anywhere how those things were heard. So I had a hard time distinguishing this from Spokio. Well, the Ninth Circuit – And the statute, and the judge, by the way, didn't even try. I agree. He just said that the very fact that the statute forbids it is enough, which I think is one thing Spokio says that's wrong. I agree that the judge did not apply the Spokio standard. And if you think the Ninth Circuit would do something differently here than it would in Spokio, or has a chance of doing something differently here, then maybe the appropriate decision is to remand and let them consider that. And while the case for Mr. Italiano's injury may be weak, which suggests why this settled for such an infinitesimal amount of the statutory damages, that does not change that the allegation was made and that – The allegation is made, but where is an allegation of some kind of injury that would actually concretely and particularly hurt him? Again – By somebody looking up on the – at Google and discovering he made those searches. Even under the common law, the public disclosure of private facts – And which are the private facts? The private facts regarding the dissolution of his marriage and things of that nature. Again, though, I think this gets – we're stuck in the same place, I think, which is you have to assume that that information isn't otherwise available. At least in a – fine, you don't want to prove it, an allegation of it. There's no allegation that that information wasn't otherwise available. So what do we do about that? I think that's the part that we're struggling with here. If the complaint is not strong enough to establish the concrete injury under what a majority of the court indicated would be sufficient under Spokio and what the lower with respect to Spokio, then the appropriate decision is to have a limited remand and take it back up, assuming that the court finds jurisdiction. Is – putting aside the question whether it's pertinent to the standing analysis, just so I understand the claims, the disclosures go to any searches that somebody  That's correct. Okay. So it may be that they have the wrong named plaintiff if the disclosures are not private. If both Gauss and Italiano don't qualify, then they might have the wrong named plaintiff. If one of the named plaintiffs satisfies it, though, under Runsfeld versus FAIR, that would be sufficient. But it has to be one of the named plaintiffs. It does have to be a named plaintiff. But your argument is passing standing. You're not challenging that. We're not challenging standing. We're not challenging the court's finding. Nobody is challenging the court's finding under Rule 23a that all the class members have common injury. The Ninth Circuit standard creates perverse incentives for class counsel to divert money away from their clients and to third parties. When courts have insisted that attorneys don't get paid unless their clients get paid, the attorneys find a way to improve the claims process and make money get to the class. Is there? I understand your fear. But as I look at the full-size press awards, they're rare. The list that I've looked at is, what, five? In how many years? It's not as if it's occurring routinely. Number one. Number two, you do point to some potentially abusive situations. But in all those situations, it's the cases where the circuit court rejected a side praise award. It seems like the system is working, not working. Well, the system will cease to work if the Ninth Circuit standard is affirmed by this Court. And otherwise, class counsel will direct settlements to the Ninth Circuit. There are two all-praise settlements with just Google alone that are pending, waiting for resolution of this decision. And the Ninth Circuit standard permits even $100 million settlements. How is the Ninth Circuit standard different than all the other standards? I thought the circuits had basically coalesced around the ALI three-factor test. The Ninth Circuit rejected that. It said all that's needed is that the money is de minimis per class member. And that's at page 8 of the Petition Appendix. And we see that in our supplemental brief where we point out that in a case with 1.3 million class members where every class member is identifiable and $3 to $9 million left over, the Court said that's de minimis. And it's okay to send all of that to a local university where the defendant can name a chair after it's sent. So is this appeal all about feasibility alone? No. It's about settlement fairness under Rule 23e. I'd like to reserve the rest of my time for rebuttal. Thank you, Counsel. General Wall. Mr. Chief Justice, and may it please the Court, two points. First, when the district court here resolved Petitioner's objections, approved the settlement agreement, and entered it as a binding judgment that appears at pages 62 to 66 of the Petition Appendix, it was exercising Article III jurisdiction, which means the plaintiffs had to have standing, and the Court's ordered Cypre relief had to redress plaintiffs' injuries under Laid Law. Neither of those is likely true here. Second, the other limitations of feasibility and fee proportionality should not be paper tigers. Lower courts need to conduct rigorous numerical analyses of feasibility and determine fees based on actual relief to the class, not, as here, based on an inflated percentage or multiplier. Meaningful limits are necessary to align incentives and deter abuse of the class action device. I don't understand your argument on the fee. I mean, I think you either decide that Cypre award provides relief or it doesn't provide relief. If it doesn't provide relief, you don't get a fee for it. But if it does provide relief, then I don't know why the fee should be cut back just because it's not money. Well, I still think you have to look at what relief it provides to the class. If the Court agrees with us that the lower courts are not being very rigorous with respect to redressability and feasibility, and it tightens the inquiry, I still think it's possible to say, Mr. Chief Justice, that tailored Cypre provides some benefit to the class, but not benefit that should be treated dollar for dollar like money in the pocket of the class members. But, I mean, I'd certainly agree that not much of a discount would be warranted if you've got really tailored Cypre. The problem here is that of the six proposals, only one even argued the World Privacy Forum's proposal even arguably deals with referral headers and the subject of this suit. But one of them, the AARP's proposal, deals with online fraud. And this wasn't even a fraud case. All the fraud claims were dismissed. And the other four just deal with Internet privacy in general. And I think if the inquiry is – if Cypre is going to be so far divorced, despite what I think are serious redressability concerns from the claimed injuries, then I don't think we can treat it anywhere near dollar for dollar. I think the discount has to be more substantial. Alito, is there any reason why we should not decide the standing question? It's a question of law. At the 12b6 stage it's the plaintiff's obligation to allege standing. If it wasn't alleged properly, sufficiently, then we should – then there isn't any standing. Why is a remand necessary? I think the Court could decide it, Justice Alito. I think it could decide it or remand. We would urge the Court to do either of those rather than dig. But why remand? Well, because I think, and Justice Gorsuch was getting at this a little bit, it isn't clear that the common law tort that everybody keeps pointing to required public disclosure of private facts about you. Here we know that somebody searched Mr. Italiano's name, but from the fact that somebody searches my name, it doesn't mean it was me. So they've developed this re-identification theory saying, oh, well, the websites you clicked through to will glean other information about you off of the Internet, and they'll be able then to reverse engineer and figure out that you were the one that did the search. That seems pretty speculative, I think, for Spokio purposes. And there isn't a record on it, though I don't know that the Court needs one. And then even beyond that, even if you could identify that these people were the ones doing the searches, if they're searching information that's already public and they're not pointing to any other additional harm, is that harm under Spokio? I think that latter part of it is a legal inquiry that I agree.  Alito, I think that every time we get a case where there's been a dismissal at the pleading stage and a question of standing arises, we should remand it to the lower court to see whether the plaintiff might be able to come up with some additional allegations, or should we decide whether the plaintiff has sufficiently alleged standing, as the plaintiff must sufficiently allege all the elements of whatever claim is being pressed? Spiro, I think the Court could decide it. If the Court thinks that on the basis of these allegations, it's got enough to decide the standing question, I think it could do that here. Breyer, we know this on that very point. We have in the complaint, quote, there was one search that was his name, Italiano, and then, quote, the name of his then soon-to-be ex-wife, end quote. All right. Now, was the search the words? It couldn't have been. The name, there must have been a different actual search. Do we know what it was? And were the words in the search soon-to-be ex-wife? Because those words would seem private, probably. And but maybe those words weren't there. Maybe all that was there was his name and his wife's name, which I don't think is private. But so do we know? So in fairness to their theory, Justice Breyer, I don't think it's the – I don't think that what they're pointing to harm is the disclosure of the information itself. I think the harm that they're claiming is the disclosure that they performed that search. I am known then to have searched for my name plus the following terms. And for the reasons I – the two reasons I gave to Justice Sotomayor's offer to expose the facts. Isn't that an injury, disclosure of what you searched? I don't think – I don't think anyone would want the disclosure of everything they searched for disclosed to other people. That seems a harm. I think on a – It may or may not be a cause of action, but it's a harm. Justice Kavanaugh, I'm not so sure. At the common law, it was at least uncertain as of the second restatement in the 19 – But it doesn't have to be exactly at common law. According to the language in Spokio, it doesn't say that. No, I – it's just an analog. Look, I will agree with you that on a particular – Just as a common sense matter. Well, on a – Just go to plain common sense. Oh, on a – What you searched for, if that's disclosed to other people? Yes. I think on a particularized basis, you could conduct searches, the disclosure of which would embarrass or harm you. But if all he searched was his own name, is that a sufficient harm for Spokio purposes? I'm not sure that it is. If it's disclosed to another person? Again, I'm not sure that it is a sufficient harm under Spokio. I will say, though, that the predicate problem, the reason I think you don't even get there, is this re-identification theory is itself so speculative. I don't think it's at all clear that the Internet sites you clicked through to could be – But isn't that a merits question? I don't think so. I think it's a question of whether they've plausibly alleged a harm. If the harm that they're pointing to couldn't occur because nobody could reverse engineer, they don't have a sufficient injury. And what is the record with respect to that question, about whether anybody can identify the person who did the search? As far as we can tell, there is no record, because the district court never re-examined this post-Spokio, and no one raised it, either because they were bound not to attack the settlement agreement or because they wanted a ruling on the merits of Cyprey. General Wall, what's the government's position on Justice Thomas' theory in Spokio that standing can be proven by violation of a legal right granted by Congress, even if it wouldn't be otherwise recognized in common law? We have not taken a position on that here, Justice Gorsuch. So what do you recommend the Court do about that? The government's got nothing to offer us? I just – we would be happy to supplementarily brief the standing question. We flagged it for the Court, and then none of the parties has really delved into it on the merits. And so I think if the Court wants to – Is that a reason why we should not decide it in the first instance? Justice Ginsburg, for the reasons I gave earlier, I think the Court could on this record, or it could remand. As long as the Court doesn't dig, both because it would leave standing a judgment that I think the Court had no jurisdiction to enter, and I think it would encourage parties not to flag jurisdictional issues at the cert stage, as the parties here should have. And just to say one word about the merits, I do think if the Court reaches the merits, the government's primary submission is the lower courts have just not been very rigorous. Why – to pick up on Justice Sotomayor's question earlier, why shouldn't that be a question for the Rules Committee and Congress to address in the first instance? Well, so look, guidance from Congress would be helpful, but in its absence, I still think we have to say what the fair, reasonable, and adequate standard means under Rule 23. The Rules Committee has essentially punted to the courts by saying the courts are actively looking at this issue. We're not going to address it. Now, they did amend the rule in various ways that I think support our approach by saying you should consider fees at the 23e stage, you can delay to see what the claims rate is, the court should be looking at the claims rate. I mean, a number of the things that they've done in the amended rule I think are designed to tighten up the inquiry. They're consistent with what we're saying here. But they didn't directly tackle the question. They, in effect, deferred to the courts. And so what we would say is, for essentially the reasons that Petitioners give, there are these three important limitations that the courts should articulate, and they should have real teeth. I think the way that Respondents talk about them, as applied here, they don't have real teeth, because there wasn't a real analysis of feasibility here. There wasn't a real analysis of redressability, and $950,000 in fees were bumped up to $2.1 million through a 2.2 multiplier that's essentially sort of plucked out of the air. It's just a reverse justification for taking $2 million in fees off of an $8 million settlement that didn't actually deliver any relief to the class on its specific claim here, which is that there's a referrer header that turns over my information. And all three of those seem like serious problems, and I think that it's important that if the court reached the merits, that it tighten them up so that we don't have to be untethered from the injury to the class and the relief that's actually being delivered. If there are no further questions, thank you. Roberts. Thank you, counsel. Mr. Pincus. Thank you, Mr. Chief Justice, and may it please the Court. To the extent Petitioners are arguing for a per se rule in validating settlements where the monetary payments only go to third parties, nothing in the Rules Enabling Act or Rule 23 authorizes a flat prohibition. And as Justice Sotomayor indicated and Judge Ruben — and Professor Rubenstein's amicus brief submits, these are very, very rare settlements. But Rule 23e's requirement that settlements be fair, reasonable, and adequate does impose significant constraints, which is why I think these settlements are rare. Maybe I'll just say something about standing because someone's probably going to ask about it. Well, go ahead. We agree with the government that there's a serious question about whether this action was ever properly in Federal court and that the standing issue has to be addressed before the Court could determine the questions presented. So that means either the case should be dismissed as improvidently granted, there should be remand, or the Court should decide the question. I think the question is complicated under Spokio. Mr. Italiano is the only plaintiff whose claims weren't addressed by the district court. In order for his claim — for him to have a substitution allegation of injury, we think it depends on this re-identification theory, as General Wall indicated. And the complaint in paragraphs 88 and 95 doesn't allege for re-identification to happen, a website operator has to get more than one search because the whole idea is you put the searches together to figure out who's making them. There's no allegation here that Mr. Italiano, for his searches, clicked on the same website, and therefore there's really no way that the re-identification takes place. Alito What does Google admit it discloses to third parties? I don't know. All of us have probably done searches. If I do a search and search for men's shoes, I will immediately get all sorts of advertisements for men's shoes or whatever other product I am searching for. So what do you admit that you disclose? Well, the issue here is — is the — there are lots of cookies and other things that — that generate the — the serving up of ads to your particular computer. The question here is the referrer header, which is that the search terms — when you — when you conduct a search, you get a list of websites. When you click on one of those sites, that site gets your search. That's the issue here. And that's not a harm? That isn't a harm? I don't think — I don't think that the mere disclosure of a search without more, your men's shoes search, is not a harm, because there's no disclosure that you're making the search. There's a disclosure that somebody searched for men's shoes. And could you — Based on — based on — based on what Justice Alito typed in, right? Someone searched for men's shoes. Well, yes, but not that Justice Alito — Well, that's kind of revelatory of private — Well, not that Justice Alito searched for men's shoes, but there was — I'm not sure how not. Excuse me? The — the — I'm not sure how not. The reverse engineering is self-evident because he is receiving the men's shoes advertising. So somehow, something he's doing is identifying his website. And given that I went into a store not long ago, and without giving them anything except my credit card, they came back with my website, I — it seems — Well, there are — there are lots of ways that information is disclosed that don't have to do with the referrer header. Again, we're talking about the referrer header here.  Oh, I see what you mean. You have cookies in your browser and other — other ways that — that you may be served ads based on your searches. That's not the claim in this case. The claim in this case — Right. But you think that problem is going to be meaningfully redressed by giving money to AARP? Well, I — I think the question is — I think — I think it is because — As if only — as if this is only a problem for elderly people? No, but AARP is not the only recipient, and elderly people are particularly — Mr. Pincus, AARP is one of the recipients. It is. And I think one of the questions that a district court has to ask is the fit between the recipients and the harm alleged in the complaint and the plaintiff class. Here, the plaintiff class was everyone who used Google in a — in a very long period, 129 million people, basically everyone on the Internet in America. It is a fact that elderly people are less knowledgeable about privacy and their vulnerability on the Internet than other people. And so having part of the award be designated for that group, we think, meets that fit. Especially when you use the — Including a group that engages in — engages in political activity, having nothing to do with the inability of elderly people to — Well, this grant had nothing to do with political activity. The AARP, like the other recipients, had to submit a proposal, and the money was specifically for that proposal. May I go back, Mr. Pincus? You talked about the re-identification theory, and I'm not quite sure I understand it. So could you tell me the technology that I need to know to understand it, and what plaintiffs would have to show to prove their own theory of harm? Well, I think this is one of the reasons why more information, either rebriefing here or a remand, is necessary. But what would have to be alleged would be that enough referrer headers went to a single website operator, that that website operator could combine them and say, aha, I can now figure out that this is the person who made the search and tie the search terms to that person. I'm not sure that would be enough. The restatement, Section 652H, seems to indicate that actual imminent damages are required for privacy violations. In other words, the mere revelation of facts at common law in 1950 — in the 1960s was not enough, let alone — I don't think so, Your Honor. I think that's a question — We're just talking about harm, and you don't have a mini-trial on whether the harm sufficient for standing is proved. I think that standing — there are two ways that standing can be contested by a defendant. One is based on the allegations of the complaint, whether they're sufficient. And the second is whether the allegations of the complaint are, in fact, backed up by real facts. Both of those are preliminary inquiries at the standing stage. In this case, Google filed a motion to dismiss Mr. Italiano's claim when the final consolidated complaint was filed. The district court didn't act on that motion. But I think the question whether — the Spokio question whether there's concrete harm has two components. One is, is it the kind of harm that's generally recognized? And then if it's not, the question is, is it an intangible harm that because of its that Congress may have elevated makes it a harm that's actionable? And I think under the Stored Communications Act, there's a real question. It's an act that both requires that a plaintiff be aggrieved, and it's an act that two circuits have said requires proof of actual damages to recover. And so I think there's a very significant question about whether that act could be said by two — that in that act, Congress could have been said to elevate that harm. Would the following make sense if we get to the merits? Professor Rudenstein's brief, I'm referring to that. Interesting. Could we say something like this? Where the actual plaintiffs receive something significant, so there were — then quite often there is money left over a little bit, some or sometimes more. But where — and in those circumstances, you apply the ALI four-step thing and just do it and be sure it's done. But where they get nothing, under those circumstances, while we wouldn't say never, what's happening in reality is the lawyers are getting paid, and they're making sometimes quite a lot of money, for really transferring money from the defendant to people who have nothing to do with it. And under those circumstances, scrutinize very carefully to see that the four standards are met. I think there should be careful scrutiny. But, I mean, you heard — I was trying to make up a — Yes. I think — I think there's a great difference between most of the cases that Mr. Frank relies on, which are cases where claimants have been identified and there is nonetheless a separate multimillion-dollar cypre payment. That's a very different case because you don't have the question of the cost of identifying the plaintiffs.  And I think it's essential to try and identify the claimants because you have a very large class and a very small settlement. There should be close scrutiny and a three-part test. One is feasibility, is the amount that the class members are likely to receive after administrative costs, taking into account what the claiming rate may be, so small that the benefit of that payment to a class member is outweighed by the indirect benefit from the third party's activity. I think that's a tough test. The district court needs discretion because there are two unknowns. One, what will the administrative costs actually be of distributing the money? And two, how many class members will claim? But that's the question the district court should ask. Second, the district court should look at the link between the harm, the claimed injury, and the recipients. We don't agree with General Wall that there's a redressability issue here. This is a settlement. Settlements between individual parties are not limited to things that would be awardable under the statute.  And the third test is no conflicts of interest. The lower courts here actually addressed that test. We don't think the fact, the happenstance that the defendant may have given contributions in the past to the organizations should rule them out, but the court should make sure that this isn't a displacement of money that the defendant would otherwise give and that the organization will control the money and decide how it's going to be used. Roberts, on that point, would you agree that the district court should never be the one suggesting possible recipients of the funds of a settlement he has to approve? I totally agree, Your Honor. I think this settlement is an agreement between the parties. The district court's role here is to apply Rule 23e and tell the parties that because one of these three tests is not met, we would submit that the settlement is not approved. And then if they, if that, then it's up to the parties to go back and come up with different recipients or a different process that meets the test. Why do you assume that simply because someone wants money in the settlement or is entitled to, that he's also opposed to what gave rise to the wrong? I mean, you may be in an auto accident with someone who's speeding. That doesn't mean you automatically think that highway safety is affected and the speed limits should be changed. Well, I just want money because of what happened to you. And I think that's why I think the critical first inquiry is, is the, is the, in the real world, is the, is the cost of distributing the money going to mean that people get essentially little or nothing or, or essentially nothing so that this indirect benefit is better? I don't think that, I think. I think Justice Kavanaugh. I'm sorry. Isn't it always better to at least have a lottery system then that one of the plaintiffs, one of the injured parties gets it rather than someone who's not injured? Why isn't that always more reasonable? We agree with the government that a lottery system would be very strange. If a class member takes the time to file a claim, it's, it seems it would be. But this is strange too. Well, I think this. I mean, it's a question of what's more strange, I think. Well, if I may answer the question. I think this is actually, and this is partially an answer to the Chief Justice question. The, the actual application of a Cypre-like doctrine here is that the class representatives and their lawyers are essentially fiduciaries to the class. And they're looking at this and saying, does it make sense at the end of the day to have this indirect benefit rather than a direct benefit that is essentially going to be a dollar? Thank you, Your Honor. Roberts. Mr. Lamken. Thank you, Mr. Chief Justice, and may it please the Court. This case undoubtedly implicates interesting policy and empirical questions. But those are the types of questions that the administrative office, the judicial conference, the advisory committee, Congress can investigate and answer. But where did the Cypre doctrine come from? Was that created by Congress? No, Your Honor. The Cypre doctrine comes out of, and it's inaptly named, from the notion that someone who gets a reward, someone who gets an award, can repurpose it to a different thing, to a different purpose, if the existing purpose isn't feasible. So, for example, we cite the Beastie Boys examples. Private parties regularly will get an award or a settlement, but they can actually instead of having that settlement come to them, go to a third party for their benefit. And the question in this case is, is there anything in Rule 23e that says that classes, that class representatives, where it's fair, reasonable, and adequate, cannot do exactly what the Beastie Boys or any other private party can. And Rule 23e doesn't answer that question by saying never. It answers that question by providing a standard of fairness, reasonableness, and adequacy. The question is what reasonableness means. I think that's right. And the question is, and the answer to that, I think, is when the alternative, when you have the possibility of getting millions of dollars of indirect relief, it is better, it is fair, reasonable, and adequate to get that when the alternative is likely nothing or the nominal equivalent of nothing. And that's the fundamental decision that A.I. made. If it's infeasible, if it's not possible to give this money out to people without it becoming practically zero, or there's a great risk of that happening, then you can take the money and give it to institutions for particular uses that serve the interests of the individual class members. And that's... Alitono, in whose opinion do they serve the interests of the individual class members? In the opinion of the individual class members? Well, the decision is initially made by the class representatives and the lawyers, and it's subject to judicial review by the court. And that in this case, rather than simply giving money to – and frankly, this is an issue that's not before the court because Petitioner didn't challenge the requisite nexus between the recipients and the interests of the class members. But turning to it anyway, in this case, specific proposals were provided, and those proposals are actually quite closely linked to not just the injury that occurred here, that underlies both the cause of action and the actual complaint, but also the specific... But there was the appearance, as the district court said in the hearing, the appearance of favoritism and alma maters of counsel. Your Honor, I think in this case the district court acknowledged that there was a potential conflict. But he did what a district court should do. He took evidence. He heard counsel – from counsel live in court, including the statement, I got my degree from Harvard, and that's simply the end of it. He reviewed detailed proposals, which carefully calibrated the money to specific harms, the impact of search terms and disclosures and third-party data flows. And the district court found, quote, no indication that counsel's allegiance to alma maters factored into selection. Unless... Roberts. Well, don't you think it's just a little bit fishy that the money goes to a charity or a 501c3 organization that Google had contributed to in the past? So, Your Honor, remember, because we're in the high-tech area and we're in an emerging area, there's only so many organizations that are going to have track records of this. And so it's not at all surprising that... Roberts. I bet there are other organizations active in the area that Google had not contributed to in the past. And many were included here. But one of the critical things is, while Google was involved, and this is at the page 40 of the Joint Appendix, it was involved in identifying potential recipients. It – counsel for class, the class, not Google, vetted the actual proposals. Class counsel, not Google, determined which recipients. Well, I know, but the allegation – you know, I mean, the allegation is that counsel for the class and the defendant are working together because no money is going to anybody else. It's just going to counsel for the – for the class. And that Google, for its part, as part of the deal – I'm not suggesting that's what's going on, but the allegation is as part of the deal – they get to give money to their favored charity. And the district court looked at it and understood that Google's role ended at selecting potential recipients. It had no role in identifying who got how much money either. And the district court heard from counsel and said, look, it's not just an accounting court change. And the court responded, I appreciate that. And that's at Joint Appendix 135. Google's own counsel explained to the court that if you look at the detail of these programs and the lack of Google's involvement in the development of the programs, it rebuts that. That's Joint Appendix 155. If you look at the actual recipients, these are not necessarily flattering recipients for Google. There's two of them that refer Google to the FTC, resulting in a $17 million fine. One of them is dedicating its – its money to, among other things, auditing from outside the Google ecosphere, Google's compliance with privacy policies. And each of them, which is where I was going just a moment ago, is specifically directed to not just privacy on the Internet, but what happens when you do searches. For example, the Berkman Center. But the appearance problem here, which has happened in many cases, is symptomatic of a broader question, which is why is it not always reasonable – more reasonable in this situation, which is a difficult one – to try to get the money to injured parties, either through pro rata distribution or some kind of lottery system, imperfect or strange as that may be. It seems to me potentially less strange, or why isn't it less strange, than giving it to people who weren't injured at all, who have affiliations with the counsel, and who, in many cases, don't need the money. Your Honor, in terms of what the standard is, yes, absolutely, the priority is to give the individual class members money. That's the number one priority. And only when it proves infeasible to do that can you go to a cy-pre result. And in this case – and I've turned the Court to Pattup 47A – the district court actually found – he looked and said, there are costs to do claims processing, costs to do claims forms, costs to do distribution. It said it's clearly infeasible when you look at those factors. How about a lottery versus this? So the lottery doesn't really help much for two reasons. First, you have to go and identify the class members in order to determine who do you give your lottery tickets to. So you don't have to go out and find the names of the 129 million people or however many you're going to submit and ask. You have to process and determine, are these valid requests for lottery tickets, or is this person not a Google user? But at least it's someone who, quote, to use your analogy, paid for the lottery ticket as opposed to giving the billion-dollar award to someone who didn't buy the lottery ticket. Well, I think – I mean, that's the – that's to use your analogy. It's a little passing strange to start – to use all of the money, virtually all the money, to actually set up this lottery process, to accept all these claims, administer that process, and then exclude the vast majority of the class and say, and we're going to take some people who were injured and are entitled to money and we're not going to give them their money. We're going to give that money to somebody else because they won the lottery. It's just a little unseemly, in addition to being grossly inefficient, because the only thing it reduces, it doesn't reduce claims administration costs in terms of accepting claims. It doesn't reduce claims administration costs in terms of vetting the claims. The only thing it reduces is the end mailing costs. That's the only thing it does. It – it reduces, to pick up on the Chief Justice's comments, the appearance of favoritism and collusion, which is rife in these cases. At least that's been the allegation. There have been lots of courts that have said that. And the district court here, as you know in the transcript, was very concerned about that. Well, he wasn't concerned about the collusion because he specifically found that it did not enter into the decision. And if the district court had – the standard everyone agrees is, if there's even a doubt, if there's substantial doubt about whether the recipients were selected on the merits, that doubt is called against the settlement. It's called in favor of trying something different. But in this case, the court of appeals and the district court both applied that ALI standard and both determined that after looking at all the evidence, after looking at the detailed proposals, after hearing from counsel, after doing all that, there wasn't that substantial doubt. And I think we can rely on our district courts to make those determinations, to be careful, and to not get engaged in the type of process that brings the judiciary into this repute. Now, if someone is a policy – Alito, if you step back from what happened in this case and cases like this, how can you say that it makes any sense? The purpose of asking for compensation, it's not injunctive relief that would benefit a broad class, but the purpose would benefit the public. It's compensation for the class members. And at the end of the day, what happens? The attorneys get money, and a lot of it. The class members get no money whatsoever, and money is given to organizations that they may or may not like and that may or may not ever do anything that is of even indirect benefit to them. So how can – how can such a system be regarded as a sensible system? So two parts of that. The first is with respect to fees. And we don't – because that's Rule 24H, a reasonable fee adder, we don't think that's before the Court either. But with respect to fees, it's well established that a court can reduce attorneys' fees if it believes that the Cypre distribution is less valuable to the class than its cash equivalent. It just happened that in this case, the district court heard objectors' arguments and said that he did not agree that the fees and incentive awards are inconsistent with the value of the class benefit, a specific finding on PEDAP 60. Moreover, class counsel's request is not disproportionate to the class benefit. So this is a situation where district courts on the ground can value what is the Cypre benefit, and they make a determination. Is the fee disproportionate result? And they can reduce it. And in fact, they have in the past, in a number of cases, reduced fees because it's a Cypre distribution. The second part, Justice Alito, is that somehow this distribution doesn't benefit the class. This isn't a case where you simply take money and give it to charity that happens to be in a space that's similar to or occupied by the underlying injuries. There are specific proposals here with a very close nexus. The injury here is that search terms are given out, and I'm going to come back to standing in a moment if I have enough time, but the search terms of individuals are given out to third parties without their consent. And the Stored Communications Act is very clear. It's not illegal to give out that information if there is consent. And both the prospective relief, the modifications to get Google's FAQs, and all these organizations are working towards making sure that the public is properly notified that this is the consequence of entering potentially extremely personal information, what your worries, your concerns are, into that search box will do. So it is not at all, even remotely the case, that this is not benefiting the class. This is targeted precisely the type of injury and precisely the type of problem of privacy invasion that that class is subjected to. You started with what for me is a very good point, which is why this is for us and not for Congress and the committee. But on the other hand, the retort to that is that the committee thinks it's for us. And maybe Congress does, too, because reasonable gives common law-like power to the courts to figure out, to put limits on these things. So how can we rely on Congress and the committee if they're thinking the court's going to do it? Well, Your Honor, I think what the court has before it is the text of a rule. And the one thing the court can't do is substitute some categorical rule that it thinks more efficient or better than the rule itself. We have to apply the rules. But isn't that what courts do all the time with the word reasonable? The rule is over time, apply, learn from experience, and then draw sometimes bright-line rules. As in Rule 23H, where it's a reasonable fee, courts typically fill reasonableness with factors and considerations. They typically don't substitute a different test, such as to say Cyprey is never fair, reasonable, and adequate. And it's certainly. Kagan. I'm sorry. Please. No. And it certainly should be fair, reasonable, and adequate when the alternative is nothing. Could I ask you to address standing, please? Yes. Okay. So turning to standing very quickly. Look, neither court below addressed the Stored Communication Act or the other four causes of action under the standard of spokio. Very few courts have. There's a dearth of authority on it. So this isn't a situation where the court should be going out on its own and addressing the issue without the benefit of the viewpoints of other jurists, without the benefit of the refinement that occurs when the case comes up from the lower courts. They simply didn't apply that standard. So the court has two options in our view. One is to remand. The alternative is to dismiss as improperly granted. If the court were inclined to think it might grant again, I think that remand would be the right answer. But this court is so – this case is so rife with vehicle problems that I think the proper answer under the circumstances is to dismiss as improperly granted. But that aside, that is in the court's discretion. Turning to the merits, if the court were to be the first to address this. Let me take an extra minute on standing. Okay. If the court were to be the first to address the Stored Communications Act under Spokio, since the framing, the rule has been that disclosure of another's communication without their consent is actionable, and the court can look to the Justice Story's opinion in Folsom v. Marsh for that. Even the recipient of a letter was not permitted to disclose that letter without the author's permission. This – in Bartnicki v. Vopper, that issue was thoroughly briefed by the United States, among others, and the court in Doe v. Chau recognized that for privacy harms, they're often actionable without specific harm, that the damage is presumed. Congress is entitled to make that same judgment in the search. Kagan. The alleged injury here, am I correct, is that a third party will know that a particular person did the search. It's not what – it's not simply the nature of the search. Is that correct? I think that when it's associated with you, that's – that is an injury. But merely disclosing your letter, even if it was an anonymous letter to a third party, I think that would have been actionable at common law. That would have been actionable before the framing. But – and Congress did make the judgment in this case that even without individual actual harm, that the presumed harm isn't sufficient, because it gave as damages not just actual harm, it gave as damages the wrongdoer's profits. There's entitlement to recover the wrongdoer's profits, which, again, is consistent with the common law. But this is an extraordinarily complex issue. You have to go deep into history that in the pageant pages we had, we didn't. I think under the circumstances, the right answer for the Court, given that this is a jurisdictional question, is to dismiss or – is to remand or dismiss as improperly granted. Thank you very much. Roberts. Mr. Frank, you have three minutes remaining. Thank you, Mr. Chief Justice, and may it please the Court. My friend is alleging that the district court made factual findings that it simply did not reach because it believed its hands were tied by the Ninth Circuit precedent. It did not look at the potential conflicts between Google and the recipients because in Lane v. Facebook, the Ninth Circuit approved a settlement where Facebook gave to a charity created by Facebook. It did not look at the difficulty of distributing to some class members because the Ninth Circuit has a de minimis standard. And as we discussed at page 22 of our reply brief, what the district court found was that it would be too hard to distribute to over 100 million class members. We don't contest that, but that's not the standard under any other court. So returning to the question that a number of justices raised, why not leave this to Congress? And I return to the example of State Oil v. Kahn, where the Court was interpreting restraint of trade under the Sherman Act. And not only was it interpreting that, but it had already had a three-decade old precedent, Albrecht, that it was being asked to reverse. And Congress had specifically considered the rule in Albrecht over those three decades and had never acted on it, yet in 522 U.S. 3, State Oil v. Kahn, the Court unanimously reversed Albrecht and came to the economically sound conclusion about the way to interpret restraint of trade. And we have courts here that are already importing a proportionality requirement into the reasonableness and fairness inquiries. And at no point do my friends indicate that Pearson v. NBTY, the Seventh Circuit decision, is wrong or why it's wrong or why it is not the superior rule here. And as we document in our opening brief, when courts demand that counsel is faithful to their fiduciary obligations, counsel responds to those incentives. The Ninth Circuit's rule creates incentives for class counsel to argue that it's too hard to get money to the class. And, in fact, the de minimis rule would take many settlements that are settling now for less than a dollar per class member, for less than $2 per class member, that distribute tens of millions, even over $100 million to class members. It's now appropriate under the Ninth Circuit's rule to take all that money and give it to the defendant's favorite charity or the plaintiff's favorite charity. If there are no further questions, I'd ask the Court to vacate and reverse. Roberts. Thank you, counsel. The case is submitted.